## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff,* | |
| vs. | Case No. 14-40135-EFM |
| WESLEY LAVERN HARRIS, | |
| *Defendant.* | |

## MEMORANDUM AND ORDER

This matter comes before the Court on Wesley Harris' Motion to Suppress Evidence (Doc. 11). Harris considers two warrantless searches of his motel room premature and unlawful. He denies that exigency justified the first search and that consent justified the second search and seizure. Additionally, he denies that inevitable discovery excuses the warrantless searches and seizure. Because the Court finds no exigency, no valid consent, and no meaningful assurance that officers inevitably would have obtained a warrant that uncovered the otherwise acquired evidence, the Court grants Harris' motion to suppress.

### I.      Factual and Procedural Background

During the early-morning hours of September 25, 2014, a masked man entered the Kwik Shop on 37th Street in Topeka, Kansas. To complement the *Joker* mask that veiled his visage, the man accessorized with cut-off fingers from costume gloves, a blue-black bag, and,

ostensibly, a functional handgun.  The man approached the counter.  There, he assaulted the lone employee in the store.  He demanded the register's money.  He also looted scrolls of Kansas Instant Lottery scratch-off tickets from their dispenser behind the counter.  Thrusting these items into his bag, the man departed—approximately $200 and several lottery tickets richer.

Topeka Police Department Officer Jared Strathman learned of the masked man's misdeeds at morning roll call that same day.  Later that morning, a Kansas Lottery official notified police that someone attempted to cash stolen tickets at a different Kwik Shop in Topeka. Officer Strathman responded to the tip.  He obtained a description of the would-be casher. Shortly thereafter, he located a female, H.B., matching the would-be casher's appearance.  H.B. carried a duffel bag and backpack.  Officers stopped H.B. for questioning.  After a brief conversation, H.B. led officers around the block to a bush that concealed a small, black handbag that she previously had secreted.  The bag contained numerous lottery tickets.  Officers removed H.B. to the police station for further interview.  But Officer Strathman parted ways to attend to another matter.

A second tip from a Kansas Lottery official called Officer Strathman away to the original robbery location.  There, he investigated another would-be casher of stolen tickets.  Officer Starthman reviewed video surveillance of the suspect.  But officers failed to locate the black-outfitted, black male.  Other duties ended Officer Strathman's pursuit.

Later that afternoon, a fellow officer asked Officer Strathman to assist in a search of the home of H.B.'s mother, C.B.  The officers expected to find cash register coin trays discarded at C.B.'s home.  C.B. gave officers consent to search her home and garbage.  A thorough inspection produced no coin trays.  But officers did recover one uncommon item, a $2 bill.  Officer Strathman regarded the $2 bill as significant.  He knew from previous investigations that such

currency is infrequently used in ordinary commerce, but Kwik Shop routinely places a specifically identifiable $2 bill in each of its stores' cash registers.  C.B. explained the bill's origins.  Around 6 a.m. that morning in her home, she observed H.B. and a black male scratching off lottery tickets.  The black male gifted the $2 bill to H.B.'s daughter.

Concurrent with these events, H.B. explained her possession of the stolen lottery tickets to F.B.I. agents.[1]  H.B. first indicated that earlier that morning an unfamiliar black male approached her at the bus stop and sold her the tickets.  She later admitted to knowing the man, specifically identifying him as her former, unfaithful boyfriend, "Wes."  H.B. produced a photo of Wes.  Throughout the interview, the F.B.I. agents confronted H.B. with incriminating charges.  The agents strategically emphasized H.B.'s possession of stolen lottery tickets, the discovery of a meth pipe in H.B.'s belongings, previously gathered evidence that H.B. engaged in prostitution, and that her false statements to the agents would potentially result in her fourth conviction involving dishonesty—any of which might separate her from her daughter.  Ultimately, H.B. admitted that she was in the car at the time of the robbery with Harris and directly received lottery tickets from him.  At some point, the agents released (and perhaps re-interviewed) H.B.

Officer Starthman knew only portions of H.B.'s interview statements.  Following the inspection of C.B.'s home, a fellow officer informed Officer Strathman that H.B. identified the black male previously with her that morning as "Wes."  Officer Strathman returned to the station

---

[1] The record is remarkably unclear about the F.B.I.'s interaction with H.B.  F.B.I. agents conversed with H.B. multiple times on September 25, 2014.  The record does not indicate exactly when the initial interview ended, when subsequent interviews occurred, and, importantly, the precise information revealed to the Topeka Police Department prior to its challenged conduct.  The issue is particularly confused considering the fact that H.B. offered conflicting accounts of her (non)participation in the robbery.  H.B.'s ultimate admission that she was *in the car* at the time of the robbery *with* Wesley Harris generates ambiguity regarding the extent of Harris' alleged involvement in the robbery.  And Officer Strathman appeared to know only part of one of her accounts prior to Harris' arrest.  At best, the Court can ascertain and relate what information the F.B.I. ultimately obtained from H.B. and, as discussed below, what information Officer Strathman received prior to the challenged conduct.

and viewed the photo of Wes that H.B. provided the F.B.I. agents.  The photo presented a black male with a unique scar on his face.  Officers began reviewing booking photos to identify the subject's last name.  An emergency call, however, suspended their review.

Emergency dispatch received a 911 call from a panicked female located at C.B.'s home. The female caller screamed "He's here!  Get the F.B.I.!"  Officer Strathman responded to the call.  He believed that H.B. made the call to indicate that Wes was at her home.  He also believed that Wes might harm H.B. for speaking with law enforcement.  When officers arrived, they encountered only H.B.  Officer Strathman then returned to the station and matched the image of a scarred "Wes" to a booking photo of Wesley Harris.  Harris was a suspect from a prior incident of lottery ticket theft.

The next lead brought officers to the apartment of a woman, W.R., suspected to know "Wes."  Officer Strathman informed W.R. that they were looking for Wesley Harris.  W.R. permitted the officers to search her apartment for Harris.  A thorough sweep of the apartment confirmed that W.R. was the only present occupant.  Officer Strathman then asked W.R. when she last saw Harris.  W.R. indicated that Harris visited her earlier that morning.  She also revealed that, at Harris' request, she drove him to the Country Club Motel and used her driver's license to rent him room 24.  Officer Strathman contacted the Country Club Motel and verified that it had rented room 24 to W.R.

Several officers converged on the Country Club Motel in search of Harris.  Initially, Officer Strathman visited with motel staff to verify again W.R.'s account and obtain a key to room 24.  Key in hand, Officer Strathman joined the team of officers surrounding room 24. Room 24 offered its front door and adjacent window to the parking lot as the only entry and exit. No lights illuminated room 24's interior.  No sounds communicated occupancy, much less

danger or mischief.  And officers did not observe or speak with anyone that observed any use to contradict room 24's bare quiescence.  Indeed, the only apparent activity was the eventual tumult of pounding fists and shouts that officers wrought against room 24 to provoke a response.

When no response followed, Officer Strathman readied the room's key.  At room 24's threshold, a fellow officer questioned whether they had authority to enter—no officer had yet applied for a search warrant.  Officer Strathman nevertheless confirmed their authority to enter: "He's wanted for a felony."  Officer Strathman handed over the key, and officers opened room 24's door.  They announced their presence and demanded that any non-officer in the room appear.  Giving no response, room 24 quickly filled with officers.  The officers swept the interior for Harris but uncovered no one.

Room 24's interior, however, did evidence recent use.  Particularly, officers spotted a noteworthy item in the bathtub—an open, blue bag containing lottery tickets, cut-off fingers from costume gloves, and a *Scream* mask.  Officers left the bag in place and untouched.  At the end of their two-minute foray into room 24, officers exited, secured the entry, and left an officer with the room's key to guard the door.  Gathering in the parking lot, an officer remarked: "We better write a warrant for that."  Officer Strathman confirmed: "Yeah, we would type a warrant for that."  But no officer subsequently prepared a warrant to search room 24.

Instead, Officer Strathman and his partner immediately returned to visit W.R.  Officer Strathman believed that W.R. lawfully could authorize a search of room 24.  He based this belief both on her status as the room's official lessee and on her hypothetical ability to obtain a room key.  W.R. never indicated, however, that she possessed a key to enter or actually did use room 24.  Nonetheless, when Officer Strathman greeted her at her home with the request for her

consent to search room 24, she approved both orally and in writing. Once W.R. signed the consent form, Officer Strathman radioed W.R.'s approval to the officers waiting at room 24.

Before Officer Strathman and his partner left W.R.'s apartment, however, W.R. shared more than her approval. She shared her suspicion that the officers' investigation concerned the robbery of a Kwik Shop. She also volunteered numerous personal observations inculpating Harris. W.R. elaborated on Harris' unexpected arrival that morning. She explained that he acted stranger than normal—peeking through windows in her home. He carried a brown bag, a blue bag with dark stripes, and an unusually large amount of money and lottery tickets. She recalled hearing on the news that the Kwik Shop robber wore a *Joker* mask, and she thought of Harris— who she believed to be tattooed with an image of the *Joker*. W.R. also revealed that Harris visited her the night before. He appeared desperate for money. He even intimated that he would partner with others and use a *Scream* mask and airsoft gun that he modified to appear as an actual handgun in order to act on his desperation. Officer Strathman and his partner gathered this unsolicited information and left to deliver W.R.'s signed consent form to the Country Club Motel.

Officers executed and completed the search of room 24 before Officer Strathman arrived with W.R.'s written consent. Relying on Officer Strathman's radio notification, officers entered room 24 and seized the blue bag containing lottery tickets, fingers removed from costume gloves, and a *Scream* mask. Before leaving the Country Club Motel, Officer Strathman delivered W.R.'s signed consent-to-search form.

A short time later that evening, officers apprehended Harris.

In October 2014, a federal grand jury returned a one-count indictment charging Harris with interference with commerce by means of robbery.[2]  Harris filed a motion to suppress evidence seized from his motel room.  The Court held a hearing in March 2015, and the matter is now before this Court.

## II.    Analysis

Harris contends that the Fourth Amendment obligates this Court to suppress the evidence ultimately seized from his motel room.[3]  The Government disagrees.  The Government defends its initial sweep and subsequent search of Harris' motel room with argument that extraordinary circumstances authorized its conduct.  Specifically, the Government claims that two exceptions to the warrant requirement (exigent circumstances and consent) and one exception to the exclusionary rule (inevitable discovery) redeem any Fourth Amendment transgressions.

Whatever view one has of the Fourth Amendment, its exceptional graces surely must be preserved from too casual invocation.  "With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no."[4]  "This presumption applies not just to homes but also to temporary residences like motel rooms."[5]  Here, the officers made no effort to obtain a warrant to search Harris' room.  Absent a warrant, the officers' conduct was presumptively unreasonable.[6]  Absent an exception, the evidence must

---

[2] *See* 18 U.S.C. § 1951(a).

[3] The Government does not contest that Harris has standing to challenge the searches of his hotel room. "Overnight guests and joint occupants of motel rooms possess reasonable expectations of privacy in the property on which they are staying."  *United States v. Kimoana*, 383 F.3d 1215, 1221 (2004) (citing *Minnesota v. Carter*, 525 U.S. 83, 89–90 (1998)).

[4] *Kyllo v. United States*, 533 U.S. 27, 31 (2001).

[5] *United States v. Livingston*, 429 Fed. App'x 751, 753 (10th Cir. 2011).

[6] *See Groh v. Ramirez*, 540 U.S. 551, 559 (2004); *Payton v. New York*, 445 U.S. 573, 586 (1980).

be suppressed.[7]   If the Fourth Amendment is going to save the officers' conduct, then the Government must shoulder its "especially heavy" burden to prove the exceptional circumstances that it claims.[8]   The Court therefore considers whether the events surrounding the officers' searches evidence the extraordinary circumstances necessary to disregard the Fourth Amendment's command that a valid warrant generally precede every entry into the home.[9]

### A. No Exigency Redeems the Officers' Initial Warrantless Sweep of Harris' Motel Room

The Government first proposes that exigent circumstances justify their initial warrantless search of Harris' motel room.   Specifically, the Government insists that their immediate, warrantless entry was necessary to protect the lives and safety of others.

The Fourth Amendment excuses a warrantless search if the "exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable."[10]   Circumstances that "pose[] a significant risk to the safety of a police officer or a third party" represent one possible compelling exigency.[11]   But a safety-based exigency will excuse deviation from the warrant requirement only if: "(1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves

---

[7] *United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014).

[8] *United States v. Najar*, 451 F.3d 710, 717 (10th Cir. 2006) (characterizing the government's burden of proof—here, concerning exigent circumstances—as greater "when the exception must justify the warrantless entry of a home"); *see also United States v. Cos*, 498 F.3d 1115, 1124 (10th Cir. 2007) ("The government has the burden of proving that the consenting party had such authority."); *Christy*, 739 F.3d at 540 ("The government bears the burden of proving by a preponderance of the evidence that the evidence would have been discovered without the Fourth Amendment violation.")

[9] *See Carter*, 525 U.S. at 100 (Kennedy, J., concurring) ("It is now settled . . . that for a routine felony arrest and absent exigent circumstances, the police must obtain a warrant before entering a home to arrest the homeowner.") (citing *Payton*, 445 U.S. at 576).

[10] *United States v. Dupree*, 540 Fed. App'x 884, 890 (10th Cir. 2014) (quoting *Kentucky v. King*, --- U.S. ---, 131 S. Ct. 1849, 1856 (2011)).

[11] *Najar*, 451 F.3d at 717; *see also Dupree*, 540 Fed. App'x at 890.

or others, and (2) the manner and scope of the search is reasonable."[12]   Courts discern the reasonableness of an officer's belief by reviewing "the realities of the situation" from the viewpoint of "prudent, cautious, and trained officers."[13]

Officer Strathman believed that immediate entry was necessary to locate Harris for others' safety.[14]   Officers arrived at the Country Club Motel for the singular purpose of *finding* Harris.[15]   Two facts jointly convinced Officer Strathman that safety concerns made warrantless entry imperative.   First, based on H.B.'s prior 911 call, he worried that Harris might harm H.B. for speaking with law enforcement.   Second, he believed that Harris recently committed an armed robbery and might still be armed.   When questioned at room 24's threshold about officers' authority to enter, however, Officer Strathman's only response was that Harris committed a felony.   He did not specify any safety concern.

The Court is unable to identify from these facts any imminent danger that a prudent, well-trained officer would consider compelling enough to perform a warrantless sweep of Harris' motel room.   The mere fact that a suspect is wanted for a felony does not create an exigency that authorizes officers to search that suspect's residence without a warrant.[16]   Additionally, no

---

[12] *Najar*, 451 F.3d at 718.

[13] *United States v. Gordon*, 741 F.3d 64, 70 (10th Cir. 2014) (quotation marks omitted).

[14] Though numerous other officers participated in the challenged conduct, only Officer Strathman testified about the Harris investigation at the suppression hearing.  With no alternative, the Court evaluates, where relevant, the circumstances from Officer Strathman's perspective for the purposes its analysis.

[15] Notably, the stated purpose of *finding* Harris conveys a lack of exigency.  The mere need to locate a suspect—present in every case—differs greatly from the actual need to respond to a particular ongoing or imminent emergency.   This testimony thus belies much of Officer Strathman's concern and supports the proposition that the putative risk of immediate harm that Harris' uncaptured presence posed (either specifically to H.B. or generally to society) was hypothetical, not actual.

[16] *United States v. Aquino*, 836 F.2d 1268, 1271 (10th Cir. 1988) (noting that "the gravity of the crime cannot in itself create sufficient exigency for a warrantless search"); *see also United States v. Mongold*, 528 Fed.

evidence demonstrates the likelihood that harm would befall H.B. absent immediate entry. Though H.B.'s 911 call troubled Officer Strathman, the facts do not substantiate his concern.  No evidence indicates that Harris actually harmed or threatened to harm H.B. during their prior encounter at C.B.'s home.[17]   Even accepting Officer Strathman's concern, officers were not responding to an emergency call from the Country Club Motel.[18]  They approached room 24 with no knowledge that someone inside needed aid.[19]  The evidence indicates that Harris was the only potential occupant of room 24.  Absent additional facts, a well-trained officer would not imagine that Harris would—even could—cause immediate harm to H.B. (or the public) from his motel room.

Room 24's condition only further undermines the Government's claim of exigency. Officers approached a lightless, silent room.  They surrounded the only entrance.  Even after numerous attempts to provoke a response from room 24, conditions remained static.  Without knowledge that the room concealed a particular endangered party[20] or a particular ongoing

---

App'x 944, 951 (10th Cir. 2013) (rejecting claim to exigent circumstances where officers presented no "other indication of heightened danger" than the fact that the occupants were either known or suspected felons).

[17] *Cf. Storey v. Taylor*, 696 F.3d 987, 996 (10th Cir. 2012) (concluding that "a report of a loud argument— without more—that has ceased by the time an officer arrives, although relevant to the exigent circumstances inquiry, does not alone create exigent circumstances…*additional* facts that would significantly increase the likelihood of violence" are required).

[18] *Cf. Najar*, 451 F.3d at 719–20 (concluding that officers' "response to a 911 call where the occupant repeatedly refused to answer the telephone or the door" supported reasonable belief that warrantless entry was immediately necessary to provide aid).

[19] *Cf. Brigham City v. Stuart*, 547 U.S. 398, 403, 406–07 (2006) (finding exigent circumstances to enter home where officers observed ongoing fight that reasonably supported belief that entry was necessary "to render emergency assistance to an injured occupant or to protect an occupant from imminent injury").

[20] *Cf. Gordon*, 741 F.3d at 70 (10th Cir. 2014) (recognizing exigency to permit warrantless home entry where officer entered home to protect victim of domestic battery who contacted police saying that she was afraid that her boyfriend would seriously harm her).

-10-

activity that threatened imminent harm to others,[21] a prudent, well-trained officer would have delayed entry.

Alternatively, the sweep exceeded the scope necessary to address the perceived risks. Even if the Court disregarded precedent and agreed that Officer Strathman's two safety concerns qualified as exigent, officers could have resolved these concerns without warrantless entry. They easily could have posted officers at the door to secure the only entrance to room 24. Not only would this tactic have ensured that, if present, Harris did not escape to cause harm to H.B. or others, but it would have afforded officers ample time to pursue a search warrant. Instead, the officers searched first and secured second. Because the officers overestimated the necessity of immediate intervention and overreacted to the present danger, the Government fails to overcome the presumption that their initial sweep was unreasonable and hence unconstitutional.

### B. No Valid Consent Redeems the Officers' Subsequent Warrantless Search of Harris' Motel Room

The Government next proposes that W.R.'s consent to search room 24 justifies the officers' warrantless reentry into Harris' motel room. The Government essentially conceded the inadequacy of W.R.'s consent during argument at the suppression hearing. Nevertheless, it presented evidence and opinion that Officer Strathman honestly believed that W.R. had authority to lawfully authorize the search of room 24. Specifically, Officer Strathman believed that W.R. could provide valid consent to search because she rented room 24 and, if she wanted, likely could obtain a key.

---

[21] *Cf. United States v. Rhiger*, 315 F.3d 1283, 1288–90 (10th Cir. 2003) (finding exigent circumstances for warrantless home entry where federal agents reasonably believed that risk of explosion from methamphetamine lab inside threatened officer and public safety).

The Fourth Amendment excuses a warrantless search if performed with a third party's valid consent.[22]  "A third party's consent to search is valid if that person has either the 'actual authority' or the 'apparent authority' to consent to a search of that property."[23]  Here, the Government fails to prove that W.R. possessed either actual or apparent authority to authorize a search of Harris' motel room.

W.R. lacked actual authority.  "[A] third party has [actual] authority to consent to a search of property if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it."[24]  The government cannot prove mutual use without offering evidence that "the third party entered the … room at will, without the consent of the subject of the search."[25]  The government also cannot prove control without offering evidence that "the relationship between the defendant and the third party is the type which creates a presumption of control for most purposes over the property by the third party."[26]  No evidence indicates that W.R. entered room 24, either with or without Harris' consent.  W.R. never even indicated that she possessed a key to enter room 24.  Without this evidence, the Government cannot prove mutual use of room 24.[27]  The Government also does not claim that W.R. and Harris shared a parent-child, husband-wife, or other relationship that triggers a

---

[22] *Cos*, 498 F.3d at 1124 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).

[23] *Kimoana*, 383 F.3d at 1221 (10th Cir. 2004) (citing *United States v. Gutierrez-Hermosillo*, 142 F.3d 1225, 1230 (10th Cir. 1998)).

[24] *Id.* (quoting *United States v. Rith*, 164 F.3d 1323, 1329 (10th Cir. 1999)).

[25] *Cos*, 498 F.3d at 1125 (quoting *Rith*, 164 F.3d at 1330).

[26] *Id*.

[27] *See id.* at 1127–28 (noting fact that third party did not possess a key to the apartment or enter premises without defendant's consent as evidence disproving mutual use).

presumption of control.[28]  While the Government does emphasize W.R.'s property relationship to the room as its official lessee, "[c]ommon authority is, of course, not to be implied from the mere property interest a third party has in the property.  The authority which justifies the third-party consent does not rest upon the law of property."[29]  Similarly, the property right that may have permitted W.R. to obtain a room key, without more, adds nothing.  W.R. thus lacked actual authority.

Similarly, W.R. lacked apparent authority.  A third party has apparent authority to consent to a search of the property if "the facts available to the officer at the moment . . . warrant a man of reasonable caution [to believe] that the consenting authority" has either mutual use or control.[30]  Before he obtained W.R.'s oral and written consent to search room 24, Officer Strathman knew only that W.R. rented and likely could access a key to room 24.  That is, Officer Strathman knew only of W.R.'s property interests.  Officer Strathman does not claim that, mistakenly, he believed W.R.'s use or control of the property to be greater.[31]  He does not claim to know any circumstances that a reasonable person would consider sufficient to temper Harris' expectation of privacy concerning the room.[32]  While apparent authority permits (even requires)

---

[28] *See id.* at 1128 (noting that third party's past dating relationship and current friendship with defendant did not create a presumption of control because it differed from relationship "between parent and child and husband and wife"  and even failed to approach co-tenant relationship that rarely suffices as evidence of control).

[29] *Kimoana*, 383 F.3d at 1222 (quoting *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974)).

[30] *Cos*, 498 F.3d at 1128 (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990)).

[31] For example, Officer Strathman does not claim that W.R. was in the position of the third-party consenter in *Kimoana* that possessed apparent (and likely actual) authority to consent to a search of a motel room because "he had stayed there overnight . . . and carried a key to the room." 383 F.3d at 1222–23.

[32] *See Cos*, 498 F.3d at 1126 ("[W]hether defendant's reasonable expectation of privacy was infringed by the third party's consent to the search is a paramount concern.")

erroneous factual conclusions,[33] it does not accommodate mistakes of law.[34]  And when the facts related to authority "cry out for further inquiry, . . . it is not reasonable for the police to proceed on the theory that 'ignorance is bliss;' "[35] they have "a duty to investigate further before relying on the consent."[36]  Because a man of reasonable caution could not determine that W.R. mutually used or controlled room 24 based on the facts known to Officer Strathman, W.R. lacked apparent authority.  Lacking both actual and apparent authority, W.R.'s consent is inadequate to remove the officers' second warrantless search from the purview of the exclusionary rule.

## C. No Evidence Convinces the Court that Officers Inevitably Would Have Discovered by Lawful Means the Illegally Seized Items

The Government ultimately relies on the inevitable discovery doctrine to save the seized evidence from exclusion.  The Government insists that, absent the second search and seizure, officers would have remained stationed outside room 24 to preserve the evidence therein.  The Government further insists that, after officers apprehended Harris, they surely would have used the information acquired throughout that day by Topeka police and the F.B.I. to apply for and obtain a warrant to search room 24.  And once the officers executed that warrant, they would have seized the same items, in the same condition, as evidence.

Evidence obtained in violation of the Fourth Amendment nevertheless will be delivered from the exclusionary rule if "there is *no doubt* that the police" ultimately or inevitably would

---

[33] *United States v. Trotter*, 483 F.3d 694, 699 (10th Cir. 2007).

[34] *United States v. Salinas-Cano*, 959 F.2d 861, 865–66 (10th Cir. 1992).

[35] *Cos*, 498 F.3d at 1129 (quoting 4 Wayne R. LaFave, SEARCH AND SEIZURE § 8.3(g) at 180 (4th ed. 2004)).

[36] *Kimoana*, 383 F.3d at 1222.

have discovered the evidence by lawful means.[37]  "[W]here the theory of inevitable discovery is that a warrant would have been obtained but for the illegal search, the district court must determine 'how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to the warrant.' "[38]  District courts consider four factors to make this determination:

> 1) the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli.[39]

 "Ultimately, the court must examine each contingency that would need to have been resolved in favor of the government and apply the inevitable discovery doctrine 'only when it has a high level of confidence' that the warrant would have"—not could have—"been issued and the evidence obtained."[40]  On balancing these factors, the Court lacks a high level of confidence that officers inevitably would have secured a warrant and discovered the items seized from room 24.

Factors (1) and (3) are particularly important.[41]  Efforts to secure particular evidence through the warrant process provide direct evidence that, absent the unlawful conduct, "a warrant would in fact have issued" and "the same evidence would have been discovered."[42]  The probability of inevitable discovery directly correlates to the speed and thoroughness of law

---

[37] *United States v. Romero*, 692 F.2d 699, 704 (10th Cir. 1982) (emphasis added); *see also Christy*, 739 F.3d at 540 (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)).

[38] *Christy*, 739 F.3d at 541 (quoting *United States v. Souza*, 223 F.3d 1197, 1204 (10th Cir. 2000)).

[39] *Souza*, 223 F.3d at 1204 (internal quotation marks and citations omitted).

[40] *Christy*, 739 F.3d at 541–42 (quoting *Souza*, 223 F.3d at 1205).

[41] *Id.* at 541; *Souza*, 223 F.3d at 1204.

[42] *Souza*, 223 F.3d at 1204 (quoting *United States v. Cabassa*, 62 F.3d 470, 473 (2d Cir. 1995)).

enforcement's efforts.[43]   Actually obtaining a warrant, of course, increases the probability of ultimate, lawful discovery.[44]   The more complete the warrant process, the more likely a warrant would have issued in time to recover the same evidence.[45]   Precautions against the removal or destruction of evidence also increase the probability of lawful seizure.[46]

Here, the first and third factors weigh against applying the inevitable discovery exception.   Officers did remain outside room 24—at least, until they illegally seized the blue bag and its contents.   This precaution increases the likelihood that the bag would have remained "in place and intact."[47]   But no evidence meaningfully increases the likelihood that a warrant would have issued.   Officers could have applied for a warrant before the initial sweep, before the second search, or before actually investigating the contents of the seized blue bag.   Instead, they made no attempt, earnest or otherwise, to "obtain a warrant prior to the unlawful search."[48]   They never ultimately obtained a warrant.   They never even started—never mind completed—a warrant application.   "Their failure to comply with the warrant requirement despite repeated opportunities exemplifies the very type of official conduct the exclusionary rule is intended to deter."[49]

---

[43] *See id.*

[44] *Id.*

[45] *Id.* (quoting *Cabassa*, 62 F.3d at 473).

[46] *See United States v. Alabi*, --- Fed. App'x ---, 2015 WL 307068, at *7 (10th Cir. Jan. 20, 2015) (identifying fact that evidence was "safely in police custody when agents examined" it as relevant to first *Souza* prong).

[47] *Id.*

[48] *Souza*, 223 F.3d at 1204 (quoting *United States v. Allen*, 159 F.3d 832, 841 (4th Cir. 1998)).

[49] *United States v. Owens*, 782 F.2d 146, 152 (10th Cir. 1986).

At most, the officers' brief, post-sweep conversation that "they better" and typically "would" write a warrant announced an intent to secure a warrant. And Officer Strathman assured the Court that officers would have applied for a warrant following Harris' arrest. But the officers' intent and Officer Strathman's post-seizure assurance do not adequately increase the likelihood that a warrant would have issued. Generally, this evidence contravenes the Supreme Court's command that "inevitable discovery involve[] no speculative elements but focus[] on demonstrated historical facts capable of ready verification or impeachment."[50] Specifically, this evidence does not approach the demonstrated *efforts* that the Tenth Circuit has recognized to support application of inevitable discovery.[51] Without objectively verifiable efforts, the Court is in a dangerous position. It risks "admitting unlawfully obtained evidence on the strength of some judge's"—and especially the government's—"speculation that it would have been discovered legally anyway."[52] Because the Government offers inadequate evidence to overcome this danger, the first and third factors caution against applying inevitable discovery.

Still, the second factor weighs in favor of applying the inevitable discovery exception.[53] The stronger the showing of probable cause "at the time the search occurred,"[54] the more

---

[50] *Nix*, 467 U.S. at 444 n.5.

[51] *Compare Alabi*, 2015 WL 307068, at *7–8 (noting that police secured the evidence and ultimately procured a search warrant for "closely related items"), *Christy*, 739 F.3d at 542 (emphasizing that officers "ultimately obtained, albeit after the illegal entry," a warrant), *United States v. Cunningham*, 413 F.3d 1199, 1204–05 (10th Cir. 2005) (finding that officers drafted a warrant affidavit before the illegal search and ultimately acquired a warrant), *and Souza*, 223 F.3d at 1205 (noting that the investigating agent both secured the evidence and arranged for his office to prepare an affidavit form that he would later complete), *with Owens*, 782 F.2d at 152–53 (emphasizing, before *Souza* four-factor test, that officers disregarded numerous opportunities to secure a warrant to search a bag taken from defendant's hotel room and no other evidence made discovery of the bag's contents inevitable).

[52] *Owens*, 782 F.2d at 152–53 (internal quotation marks omitted).

[53] Harris challenges both the initial sweep and the subsequent search. But he seeks to suppress evidence seized from the second search. The Court thus examines the strength of probable cause that existed immediately preceding the second search, excluding any knowledge illegally obtained from the first search.

probable that officers *could* have obtained a warrant.[55]  Either a valid warrant to search room 24

or a valid warrant to arrest Harris in his apartment inevitably would have positioned officers to

discover and seize the blue bag and its contents.  Both warrants require probable cause.  A valid

search warrant requires that the totality of the facts and circumstances presented in the warrant

affidavit allow "'a man of reasonable caution' to believe that evidence of a crime will be found

at the place to be searched."[56]  Similarly, a valid arrest warrant requires that the warrant affidavit

state enough facts to demonstrate the "substantial probability that a crime has been committed

and that a specific individual committed the crime."[57]  An arrest warrant "implicitly carries with

it the limited authority to enter a dwelling in which the suspect lives when there is reason to

believe the suspect is within."[58]

Officer Strathman likely possessed sufficient facts before the second search to enable a

neutral magistrate to believe either that Harris committed a felony or that room 24 contained

evidence of that felony.  Officer Strathman knew that a masked, black male threatened a Kwik

Shop employee with a handgun to obtain cash and lottery tickets.  Officer Strathman knew that

---

[54] *Souza*, 223 F.3d at 1204.

[55] Again, the Court emphasizes the "great importance" of factors (1) and (3).  *Id.*  The strength of probable cause only indicates whether officers had sufficient ability to lawfully gain access to the evidence.  It does not, like factors (1) and (3), support the conclusion that officers inevitably would have pursued that recourse.  "[T]o excuse the failure to obtain a warrant merely because the officers had probable cause and could have obtained a warrant would completely obviate the warrant requirement."  *Id.* at 1203, n.8 (quoting *United States v. Mejia*, 69 F.3d 309, 319–20 (9th Cir. 1995)).  Overreliance on factor (2) thus may be fatal.  But, coupled with some effort to comply with the warrant process, a showing of probable cause may be "strong enough to convince us not just that a magistrate *could* have issued a warrant, but that a magistrate *would have* issued one."  *Alabi*, 2015 WL 307068, at *8.

[56] *United States v. Nolan*, 199 F.3d 1180, 1183 (10th Cir. 1999) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983) (plurality)).

[57] *Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996) (quotation marks omitted); *see also* Fed. R. Crim. P. 4(a).

[58] *Payton*, 445 U.S. at 603.

two individuals—an unidentified black, male suspect and H.B.—attempted to cash stolen lottery tickets the same day after the robbery.  Officer Strathman found H.B. in possession of stolen lottery tickets.  He also found an uncommon item commonly kept in Kwik Shop cash registers, a $2 bill, at H.B.'s home.  H.B.'s mother, C.B., explained that a black male left the $2 bill there earlier that morning after she observed him scratching off lottery tickets with her daughter.  H.B. identified the black male, "Wes," as a suspect somehow involved in the lottery ticket robbery.  Officer Strathman verified the identity of "Wes" to be Wesley Harris, a suspect from a previous lottery ticket theft.  Officer Strathman then learned that, earlier that day, W.R. took Harris to the Country Club Motel and rented him room 24.  Officer Strathman verified that W.R. rented room 24.  From these facts, a neutral magistrate could conclude that a felony occurred,[59] that Harris committed and possessed evidence of the felony,[60] and that officers reasonably could expect to find Harris or evidence of the felony at Harris' last known residence,[61] room 24 of the Country Club Motel.[62]  This showing of probable cause favors applying inevitable discovery.[63]

---

[59] *See* 18 U.S.C. § 1951 (making it unlawful to obstruct, delay, or affect commerce or articles of commerce by robbery).

[60] *See United States v. Williams*, 238 Fed. App'x 384, 387 (10th Cir. 2007) (explaining that "[p]robable cause only requires a fair probability of criminal activity," not some greater, especially conclusive, proof).

[61] *See United States v. Biglow*, 562 F.3d 1272, 1279 (10th Cir. 2009) (explaining that hard evidence or personal knowledge of illegal activity is not required to "link a Defendant's suspected unlawful activity to his home").

[62] The strength of probable cause likely increases by including either the information gathered during officers' second interview with W.R. or the full content of H.B.'s F.B.I. interview(s).  Prong 2 focuses on the strength of probable cause "at the time the search occurred." *Souza*, 223 F.3d at 1204.  It is not exactly clear when the second search occurred.  But several facts are clear.  First, Officer Strathman received the information from W.R. further incriminating Harris *after* radioing W.R.'s consent.  Second, officers completed the search of room 24 *before* Officer Strathman immediately returned from obtaining W.R.'s consent.  Finally, Officer Strathman did not learn the full details of H.B.'s interview(s) with the F.B.I until after Harris' arrest.  W.R.'s statements and H.B.'s complete interview statements, therefore, likely could not contribute to Officer Strathman's estimation of probable cause before the illegal search.  Accordingly, the Court gives these circumstances less weight.

[63] While concluding that officers likely possessed probable cause, the Court offers no opinion that another judge would in fact have accepted this showing—especially considering Harris' objections to H.B.'s reliability

Last, the fourth factor balances evenly, neither for nor against applying the inevitable discovery exception. Officers obviously jumped the gun—that is, they searched Harris' motel room before obtaining lawful authority, twice. But no evidence indicates that they acted so hastily "because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli."[64] Rather, they prematurely searched Harris' motel room because they relied on W.R.'s consent. For reasons previously discussed, the officers' reliance was misplaced. They correctly understood W.R.'s actual relationship to the room but unreasonably concluded that her relationship was legally adequate to provide her authority to consent. "No mistake of law, as opposed to a mistake of fact, can be reasonable or form the basis for probable cause even if that mistake of law was in good faith."[65] Because the search occurred as a result of an unreasonable mistake of law and not to create a fait accompli, the Court balances this factor neither to favor nor to disfavor applying inevitable discovery.[66]

On final assessment, the weight of these factors advises against making an exception for officers' conduct toward Harris. Officers jumped the gun, but not to accomplish a search for which they believed that they lacked probable cause. Indeed, the strength of probable cause certainly encourages the likelihood that evidence could have been discovered. But the lack of any effort, at any time, to obtain a warrant more forcefully discourages the likelihood that evidence would have been discovered. "[W]hat makes a discovery 'inevitable' is not probable

---

based on her inconsistent statements and past falsity—as sufficient. Not uncommonly, "there is some room for disagreement" and "thus a residual possibility that a magistrate judge would have required a stronger showing of probable cause." *Cabassa*, 62 F.3d at 473–74.

[64] *Souza*, 223 F.3d at 1204.

[65] *United States v. Troxel*, 564 F. Supp. 2d 1235, 1242 (D. Kan. 2008) (citing *Salinas-Cano*, 959 F.2d at 865–66).

[66] *See id.*

cause alone . . . but probable cause plus a chain of events that would have led to a warrant . . . independent of the search."[67]   The Government has proven more probable than not the strength of one link, but not the chain.   Accordingly, the Court lacks the "high level of confidence"[68] required to say: "there is *no doubt* that the police" ultimately or inevitably would have discovered the evidence by lawful means.[69]

To conclude, the Government argues as follows.  Officers had probable cause.  Although officers did not use this probable cause to apply for a warrant as required, they could have.  And if they had applied, they probably would have received a warrant that led to discovering the seized evidence.  So, in *this* case, the Court might as well retroactively validate their conduct and admit the evidence.  The Court, however, cannot distinguish *this* case from *every* case where an officer can demonstrate probable cause.  To accept probable cause alone is to probably cause the (inevitable discovery) exception to swallow the (warrant requirement) rule.  As explained by the Supreme Court:

> That we cannot do.  It is apparent that the agents in this case acted with restraint.  Yet the inescapable fact is that this restraint was imposed by the agents themselves, not by a judicial officer.  They were not required, before commencing the search, to present their estimate of probable cause for detached scrutiny by a neutral magistrate.  They were not compelled, during the conduct of the search itself, to observe precise limits established in advance by a specific court order.  Nor were they directed, after the search had been completed, to notify the authorizing magistrate in detail of all that had been seized.  In the absence of such safeguards, this Court has never sustained a search upon the sole ground that officers reasonably expected to find evidence of a particular crime and voluntarily confined their activities to the least intrusive means consistent with that end.  Searches conducted without warrants have been held unlawful 'notwithstanding

---

[67] *Souza*, 223 F.3d at 1204 (quoting *United States v. Brown*, 64 F.3d 1083, 1085 (7th Cir. 1995)).

[68] *Souza*, 223 F.3d at 1205.

[69] *Romero*, 692 F.2d at 704 (emphasis added); *see also Christy*, 739 F.3d at 540 (10th Cir. 2014) (quoting *Nix*, 467 U.S. at 444).

facts unquestionably showing probable cause,' for the Constitution requires 'that the deliberate, impartial judgment of a judicial officer be interposed between the citizen and the police.'   'Over and again this Court has emphasized that the mandate of the (Fourth) Amendment requires adherence to judicial processes,' and that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable . . . .[70]

Thus, "in most cases, the failure of the police to secure a warrant will probably be fatal."[71]   The Government offers insufficient proof that officers acted under circumstances exceptional enough to distinguish their situation from "most cases."   Their failure to obtain a warrant is fatal.

**IT IS THEREFORE ORDERED** that the Defendant's Motion to Suppress Evidence (Doc. 11) is hereby **GRANTED**.

**IT IS SO ORDERED**.

Dated this 9th day of April, 2015.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[70] *Katz v. United States*, 389 U.S. 347, 356–57 (1967) (internal citations omitted).

[71] *Souza*, 223 F.3d at 1206.